UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) No. 2:25-CR-42 |
| v. | ) |
| | ) JUDGE Corker/Wyrick |
| NATHAN HUNTER WHITAKER | ) |

## PLEA AGREEMENT

The United States of America, by the United States Attorney for the Eastern District of Tennessee, and Nathan Hunter Whitaker, and the defendant's attorney, Timothy Hudson, have agreed upon the following:

1. The defendant will waive indictment and arraignment and plead guilty to an information charging the defendant with the following offense(s): Count One. Distribution of a mixture and substance containing a detectible amount of fentanyl (N-phenyl-N- [1-(2-phenylethyl)-4-piperidinyl] propanamide), which resulted in death, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). The punishment for this offense is as follows:

    a) A term of imprisonment of not less than 20 years, up to life,

    b) A fine of not more than $1,000,000,

    c) A term of supervised release of not less than 3 years, up to life, and

    d) A $100, mandatory, special assessment fee.

2. In consideration of the defendant's guilty plea, the United States agrees to move the Court at the time of sentencing to dismiss the indictment against the defendant in case number 2:24-CR-58.

NW

3. The defendant has read the information, discussed the charges and possible defenses with defense counsel, and understands the crime charged. Specifically, the elements of the offense are as follows:

    a) the defendant knowingly or intentionally distributed, or aided and abetted the distribution of a quantity of fentanyl (N-phenyl-N- [1-(2-phenylethyl)-4-piperidinyl] propanamide),

    b) the defendant knew at the time of the distribution that the substance was a controlled substance, and

    c) death resulted from the use of the controlled substance that the defendant distributed or aided and abetted the distribution.

4. In support of the defendant's guilty plea, the defendant agrees and stipulates to the following facts, which satisfy the offense elements. These are the facts submitted for purposes of the defendant's guilty plea. They do not necessarily constitute all of the facts in the case. Other facts may be relevant to sentencing. Both the defendant and the United States retain the right to present additional facts to the Court to ensure a fair and appropriate sentence in this case.

    a) In July of 2020, investigators of the Johnson City Police Department (JCPD), along with investigators of several, state and federal agencies, initiated an investigation into the distribution of cocaine, crack cocaine, and methamphetamine by the Spencer Bradley Drug Trafficking Organization (Bradley DTO) (2:23-CR-120). During the course of the investigation, they encountered and arrested Clinton Cross Peregory Carr (2:23-CR-110) (Clinton Carr) on multiple occasions. The investigation also identified co-

2

conspirators of Clinton Carr. The defendant was identified as a co-conspirator of Clinton Carr's narcotics trafficking operation.

b) On February 8, 2023, Sullivan County (TN) Sheriff's Office responded to a residence in Bluff City, TN, after a female called 911 and reported that her 24 year old spouse (hereinafter, "J.E.C.") was unresponsive. The female stated she returned home from work just before 7 a.m. When she arrived home, J.E.C. appeared normal. She and J.E.C. spoke and made plans about their day, and then she went to sleep. When she awoke around 1:00 p.m., J.E.C. was laying partially in the bed next to her, unresponsive. She called 911 to report a medical emergency and attempted cardiopulmonary resuscitation in an attempt to revive him, but was unsuccessful.

c) The spouse was interviewed by law enforcement. She stated that J.E.C. was known to use "shrooms," which the investigator knew to be a reference to psylocibin mushrooms and to "smoke," which investigators knew referred to the use of marijuana. The decedent's spouse also provided a medical history to the investigator, to include his use of prescription medications for non-threatening medical issues. On February 9, 2023, law enforcement conducted a search of the residence of J.E.C. and recovered was a white powder, which tested positive for cocaine and blue pills, which tested positive for fentanyl.

d) Clinton Carr and the defendant were identified as suspects in the overdose death of J.E.C. As a part of their investigation, law enforcement reviewed the Facebook account communications of the defendant and J.E.C. The review identified several communications between the defendant and J.E.C.

3

i) On January 16, 2023:

Defendant to J.E.C. at 4:48 UTC: "Need any"

J.E.C. to defendant at 5:33 UTC: "Did you take me off snapchat? lol"

Defendant to J.E.C. at 5:58 UTC: "No why"

J.E.C. to defendant at 5:58 UTC: "It says we arent friends"

Defendant to J.E.C. at 5:58 UTC: "Check now"

J.E.C. to defendant at 5:59 UTC: "It got it I think it's the service here fucking with it"

Defendant to J.E.C. at 5:59 UTC: "It very could be"

Defendant to J.E.C. at 6:00 UTC: "Very well could be"

J.E.C. to defendant at 6:02 UTC: 84 second phone call

J.E.C. to defendant at 6:02 UTC: Jacob unsent a message

J.E.C. to defendant at 6:09 UTC: "Yea my snaps not working as soon as I can read it I'll get back with you"

Defendant to J.E.C. at 6:25 UTC: "I'll do you 10 for 250 or 5 for 125".

ii) On January 17, 2023:

J.E.C. to defendant at 17:58 UTC: "Can you do it now"

J.E.C. to defendant at 17:58 UTC: "instead of moro"

Defendant to J.E.C. at 17:58 UTC: "yea 25?"

J.E.C. to defendant at 17:58 UTC: "Mins?"

J.E.C. to defendant at 17:58 UTC: "TAco Bell"

Defendant to J.E.C. at 18:00 UTC: "Yeah that's fine what time?"

J.E.C. to defendant at 18:00 UTC: "I'll be there in 10 mins"

                Defendant to J.E.C. at 18:01 UTC: "Give me 10 mins then head there's"

                J.E.C. to defendant at 18:01 UTC: "I'm already out I'll be there early, i gtta get gas anyways"

                Defendant to J.E.C. at 18:08 UTC: "Alright I'll be there in 10 min"

                Defendant to J.E.C. at 18:29 UTC: 22 second phone call

    iii)    On February 06, 2023:

                J.E.C. to defendant at 14:37 UTC: "Where we stand on ex?"

                J.E.C. to defendant at 17:14 UTC: "I'm about home."

                J.E.C. to defendant at 17:28 UTC: Missed phone call.

                J.E.C. to defendant at 17:29 UTC: Missed phone call.

                Defendant to J.E.C. at 17:32 UTC: 105 second phone call.

                J.E.C. to defendant at 17:46 UTC: Missed phone call.

e)    On February 9, 2023, an autopsy of J.E.C., conducted at the William L. Jenkins Forensic Center at East Tennessee State University by Dr. Ellen Wallen determined the cause of death to be fentanyl toxicity, with associated pulmonary edema. Postmortem toxicological analysis of the decedent's blood detected caffeine, as well as 11 ng/mL of fentanyl, .38 ng/mL of 4-ANPP, and 2.2 mg/nL of norfentanyl, a fentanyl metabolite.

f)    On February 10th, 13th, and 24th, of 2023, law enforcement, utilizing a confidential informant (CI), made controlled purchases of pressed fentanyl pills from the defendant. On February 10, 2023, law enforcement purchased ten fentanyl-laced pills from the defendant. DEA laboratory analysis

5

confirmed the pills contained a mixture or substance containing 1.05 grams of fentanyl. On February 13, 2023, law enforcement again purchased fentanyl-laced pills from the defendant. DEA laboratory analysis confirmed the pills contained a mixture or substance of 6.81 grams of fentanyl. Finally, on February 24, 2023, law enforcement used a CI to purchase fentanyl-laced pills from the defendant. DEA analysis confirmed the pills contained a mixture or substance of 11.99 grams of fentanyl.

g) On February 16, 2023, JCPD was conducting surveillance in the Bradley DTO case. Law enforcement conducted a traffic stop of a vehicle for speeding after it left a known drug house and Clinton Carr was identified as a passenger of the car. Clinton Carr was found to be in possession of approximately 28 grams of cocaine and a loaded firearm. Investigators were also able to identify Clinton Carr as a source of fentanyl in the Eastern District of Tennessee.

h) On April 2, 2023, law enforcement interviewed a subject at a hospital in Johnson City, TN, as a result of a drug overdose. The subject stated that they had recently met with the defendant to purchase narcotics. The subject stated that the defendant sold them four "blue 30's" for $80.00. Law enforcement is aware that "blue 30's" is a term used to identify the prescription medication of Roxicodone M-30, 30mg pills, which of late are often counterfeit and laced with fentanyl. The subject ingested one of the pills and then drove home after dropping of the defendant at a residence where defendant was staying. The defendant suffered the effects of an overdose after consuming the pill

6

obtained from the defendant. The subject admitted to purchasing pills from the defendant a couple of times a week.

i) On April 5, 2023, a Trooper with the Tennessee Highway Patrol observed a vehicle operating westbound on Interstate 26 in the Eastern District of Tennessee with an improper registration plate. The Trooper conducted a traffic stop of the vehicle and identified Clinton Carr as the driver. A search of the vehicle revealed approximately 600, counterfeit Roxicodone pills laced with fentanyl. In addition to the counterfeit pills, law enforcement recovered a Kimber, .357 Magnum revolver. Clinton Carr admitted to possession of the 600, counterfeit Roxicodone M-30 pills containing fentanyl. He also admitted that he purchased the firearm for protection.

j) On May 23, 2023, the 2nd Judicial District Drug Task Force of Sullivan County, TN, executed a search warrant at a Kingsport, TN, residence. During a search law enforcement located the defendant, Clinton Carr, and several others, including Andrew Bentley and Jasmine Carr (2:24-CR-58). A search of the residence recovered a fake Red Bull can on the kitchen counter, which contained 21 fake, Roxicodone M-30 pills that contained fentanyl. Andrew Bentley admitted that the fake Red Bull can was his and there should be 20-30 pills in the can. In a room shared by Clinton Carr and his wife, Jasmine Carr, law enforcement recovered a Kimber .45 caliber pistol, six (6) fake M30 pills containing fentanyl, and a pocketbook containing a Smith & Wesson 9mm handgun. In another room they recovered a Palmetto State Arms AR15-style rifle belonging to Clinton Carr. They also recovered $7,523 in cash from

7

Clinton Carr's person and the residence. Clinton Carr admitted that he distributed cocaine and fentanyl for profit. The defendant was interviewed by law enforcement and asked about his involvement in the distribution of fentanyl to J.E.C. The defendant denied knowing J.E.C. Law enforcement terminated the interview when the defendant asked for legal counsel.

k) Law enforcement debriefed a cooperating defendant, who identified the defendant as a source of fentanyl-laced pills in the Eastern District of Tennessee, with his activity of distributing fake Roxicodone pills laced with fentanyl beginning approximately 6 months prior to May 23, 2023, which would include the timeframe of the death of J.E.C. Law enforcement also learned that a female had overdosed on fentanyl-laced pills that were distributed from Clinton Carr to the defendant, who then distributed them to the female. The female was revived through the use of Narcan.

l) On April 1, 2024, agents with the U.S. Department of Homeland Security, Homeland Security Investigations (HSI) and the Second Judicial Drug Task Force (2nd DTF) tracked the defendant to a residence located in Johnson City, TN. The residence was identified as an Airbnb rental which had been rented by Jasmine Carr. The defendant had an existing warrant for his arrest charging him with the distribution of fentanyl, which was issued in Sullivan County, TN. Agents with HSI, the 2nd DTF, and deputies with the Carter County Sheriff's Office (CCSO) observed the defendant and Jasmine Carr leave the residence in a vehicle. CCSO attempted to conduct a traffic stop of the vehicle; however, the vehicle accelerated at a high rate of speed, and a

pursuit was initiated. The pursuit was eventually terminated for the officer and public's safety. During this time, a 2nd DTF agent maintained surveillance on the residence.

m) Shortly after termination of the pursuit the vehicle returned to the residence and both the defendant and Jasmine Carr ran into the residence after attempting to cover the vehicle with a camouflage tarp. Agents and deputies went back the residence. While securing the residence, law enforcement noticed that there were numerous gun boxes and bags observed in the bed of a Ford Ranger that was backed up to a garage attached to the residence. Law enforcement approached the front door, knocked, and announced. A male subject, later identified as Anthony Tolley (also a defendant in 2:24-CR-58), opened the door and was detained. Law enforcement made entry into the residence to locate the defendant and Jasmine Carr, and anyone else inside of the residence. Law enforcement observed various gun parts laying in the living area. Jasmine Carr was found in a locked bathroom that was attached to the master bedroom of the residence. Law enforcement learned that the defendant had fled out the rear of the residence. He was apprehended a short time later.

n) Agents and deputies cleared the residence and located another female. While securing the residence, law enforcement observed numerous firearms and gun parts scattered throughout the area. A consent to search was obtained. Law enforcement secured approximately 2 grams of a white powdery substance consistent with cocaine and 13 blue pills containing fentanyl. Additionally,

9

there were firearms, consisting of pistols, rifles, and shotguns, in various boxes and bags with ammunition and gun parts located in the bed of the Ford Ranger parked at the residence. Law enforcement also recovered:

i) 21 grams of blue pills containing fentanyl, located in the doorway of a hallway bathroom,

ii) 3 plastic Ziploc style bags containing approximately 1139 grams of blue pills containing fentanyl, located under the master bathroom vanity,

iii) a bag containing approximately 8 grams of a white powdery substance consistent with cocaine, located under the master bathroom vanity,

iv) $13,754 U.S. currency in a backpack found lying in the hallway bathroom, and

v) 69 firearms in various locations throughout the downstairs of the residence.

Among the firearms seized were two firearms equipped with silencers and short-barreled rifle. Law enforcement determined that the following, recovered firearms were stolen –

i) a GLOCK 19, 9mm pistol,

ii) a Black Rain Ordnance, Spec 15, AR15-style rifle, multi caliber, and

iii) a GLOCK 40, 10mm, pistol.

The defendant admitted that the firearms and narcotics seized at the Airbnb were his.

o) On April 8, 2024, law enforcement interviewed a cooperating defendant. During the interview, Anthony Tolley was identified as a distributor of fake

10

M30, fentanyl-laced pills on behalf of the defendant. On that same date, in a related case, during an interview of a cooperating defendant, law enforcement learned that a source of fake, Roxicodone M-30, fentanyl-laced pills in the Eastern District of Tennessee would charge a buyer $70,000 for 80,000 pills. For smaller amounts, the source would charge as much as $2-$4 per pill for quantities of 10,000-15,000 pills, but for larger amounts the price would drop to as low as $1. The pills would then be distributed for $8 per pill. The defendant was distributing 10,000-20,000 pills weekly.

p) On March 2, 2024, Anthony Tolley was arrested by the Bristol (TN) Police Department (BTPD) when they received a complaint of an unresponsive male in a vehicle. During a consent search of the car, officers located a glass pipe with residue and burn marks, 2 metal rods that were believed to be of the type commonly used as a "push-rod" used for smoking crack cocaine, a white rock substance believed to be crack cocaine, approximately 55 pills believed to be pressed with fentanyl, 6 yellow pills also believed to be pressed with fentanyl, a baggie of what is believed to be baking soda, approximately 1.95 grams of a green leafy plant material believed to be marijuana, and $4,031.07 in cash.

q) On April 11, 2024, law enforcement interviewed a cooperating defendant regarding their involvement in drug trafficking. The cooperating defendant stated that the defendant was a supplier of fentanyl-laced pills, but when the defendant was unable to supply, the cooperating defendant would get fentanyl-laced pills from Eric Frye (2:24-CR-58). Law enforcement also learned that the pills and money seized from co-defendant Anthony Tolley at

11

the time of his arrest by BTPD on March 2, 2024, belonged to co-defendant Nathan Whitaker.

r) In mid-April of 2024, the Elizabethton Police Department arrested a subject who agreed to cooperate. The subject stated that they were a prior user of fentanyl. The subject identified the defendant as their former source of supply of fentanyl pills. The subject stated that the defendant purchased approximately 30,000 pills at a time and resells them for $5-$8 per pill.

s) On May 10, 2024, law enforcement interviewed a cooperating CI, who was then detained at a local jail. The subject was charged with possessing pressed fentanyl pills. The subject stated that Clinton Carr and Jasmine Carr are distributors of fentanyl-laced pills in the Eastern District of Tennessee. Jasmine Carr was known to travel with Clinton Carr when he was resupplying with fentanyl-laced pills. The CI stated that defendant was also a supplier of fentanyl-laced pills. The subject would purchase 50-100 fentanyl-laced pills at time from either the defendant or Eric Frye.

t) The defendant now agrees and stipulates that he distributed a quantity of fentanyl (N-phenyl-N- [1-(2-phenylethyl)-4-piperidinyl] propanamide), a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1), and (b)(1)(C), and that the distribution of that quantity of fentanyl directly resulted in the death of J.E.C. The defendant further agrees and stipulates that the source of fentanyl that he distributed was provided to him by Clinton Carr.

5.  The defendant is pleading guilty because the defendant is in fact guilty. The defendant understands that, by pleading guilty, the defendant is giving up several rights, including:

   a) the right to be indicted by a grand jury for these crimes;

   b) the right to plead not guilty;

   c) the right to a speedy and public trial by jury;

   d) the right to assistance of counsel at trial;

   e) the right to be presumed innocent and to have the burden of proof placed on the United States to prove the defendant guilty beyond a reasonable doubt;

   f) the right to confront and cross-examine witnesses against the defendant;

   g) the right to testify on one's own behalf, to present evidence in opposition to the charges, and to compel the attendance of witnesses; and

   h) the right not to testify and to have that choice not used against the defendant.

6.  The parties agree that the appropriate disposition of this case would be the following as to each count:

   a) The Court may impose any lawful term(s) of imprisonment, any lawful fine(s), and any lawful term(s) of supervised release up to the statutory maximum(s);

   b) The Court will impose special assessment fees as required by law; and

   c) The Court may order forfeiture as applicable and restitution as appropriate.

No promises have been made by any representative of the United States to the defendant as to what the sentence will be in this case. Any estimates or predictions made to the defendant by defense counsel or any other person regarding any potential sentence in this case are not binding on the Court and may not be used as a basis to rescind this plea agreement or withdraw the defendant's

13

guilty plea(s). The defendant understands that the sentence in this case will be determined by the Court after it receives the presentence investigation report from the United States Probation Office and any information presented by the parties. The defendant acknowledges that the sentencing determination will be based upon the entire scope of the defendant's criminal conduct, the defendant's criminal history, and pursuant to other factors and guidelines as set forth in the Sentencing Guidelines and the factors set forth in 18 U.S.C. § 3553.

7. Given the defendant's agreement to plead guilty, the United States will not oppose a two-level reduction for acceptance of responsibility under the provisions of Section 3E1.1(a) of the Sentencing Guidelines. Further, if the defendant's offense level is 16 or greater, and the defendant is awarded the two-level reduction pursuant to Section 3E1.1(a), the United States agrees to move, at or before the time of sentencing, the Court to decrease the offense level by one additional level pursuant to Section 3E1.1(b) of the Sentencing Guidelines. Should the defendant engage in any conduct or make any statements that are inconsistent with accepting responsibility for the defendant's offense(s), including violations of conditions of release or the commission of any additional offense(s) prior to sentencing, the United States will be free to decline to make such motion, to withdraw that motion if already made, and to recommend to the Court that the defendant not receive any reduction for acceptance of responsibility under Section 3E1.1 of the Sentencing Guidelines.

8. The defendant agrees to pay the special assessment in this case prior to sentencing.

9. Unless otherwise limited by an agreed preliminary order of forfeiture, the defendant agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, which are in the possession or control of the defendant or the defendant's nominees that were used and intended to be used in any manner or part to commit and to facilitate the

commission of a violation of [STATUTE ALLOWING FORFEITURE], and/or any and all assets and property, or portions thereof, subject to forfeiture as proceeds of the defendant's criminal activities which are in the possession or control of the defendant or the defendant's nominees.

The defendant agrees to forfeit the defendant's interest in the following properties [list properties/assets being forfeited in agreed preliminary order of forfeiture.]

The defendant further agrees to assist the United States fully in the identification, recovery, and return to the United States of any other assets or portions thereof subject to forfeiture. The defendant further agrees to make a full and complete disclosure of all assets over which the defendant exercises control and those which are held or controlled by a nominee. The defendant agrees to forfeit all interests in the properties as described above and to take whatever steps are necessary to pass clear title to the United States. These steps include, but are not limited to, the surrender of title, the signing of a consent decree of forfeiture, and the signing of any other documents necessary to effectuate such transfers. The defendant agrees not to object to any civil or criminal forfeiture brought against these properties. The defendant agrees to take all such steps to locate such property and to pass title to the United States before the defendant's sentencing.

In the event a money judgment forfeiture is ordered, the Defendant agrees to send all money judgment payments to the United States Marshals Service. Defendant also agrees that the full money judgment amount shall be considered due and payable immediately. If the defendant cannot pay the full amount immediately and is placed in custody, the defendant agrees that the Bureau of Prisons will have the authority to establish payment schedules to ensure payment of the money judgment. The defendant further agrees to cooperate fully in efforts to collect on the money judgment by set-off of federal payments, execution on non-exempt property, and any other means the United States deems appropriate. The defendant and counsel also agree that the defendant may

15

be contacted post-judgment regarding the collection of the money judgment without notifying defendant's counsel and outside the presence of the defendant's counsel.

10. The defendant agrees that the Court shall order restitution, pursuant to any applicable provision of law, for any loss caused to: (1) the victim(s) of any offense charged in this case (including dismissed counts); and (2) the victim(s) of any criminal activity that was part of the same course of conduct or common scheme or plan as the defendant's *charged* offense(s).

11. Financial Obligations. The defendant agrees to pay all fines and/or restitution to the Clerk of Court. The defendant also agrees that the full fine and/or restitution amount(s) shall be considered due and payable immediately. If the defendant cannot pay the full amount immediately and is placed in custody or under the supervision of the Probation Office at any time, the defendant agrees that the Bureau of Prisons and the Probation Office will have the authority to establish payment schedules to ensure payment of the fine and/or restitution. The defendant further agrees to cooperate fully in efforts to collect any financial obligation imposed by the Court by set-off of federal payments, execution on non-exempt property, and any other means the United States deems appropriate. The defendant and counsel also agree that the defendant may be contacted post-judgment regarding the collection of any financial obligation imposed by the Court without notifying the defendant's counsel and outside the presence of the defendant's counsel. In order to facilitate the collection of financial obligations to be imposed with this prosecution, the defendant agrees to disclose fully all assets in which the defendant has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, nominee, or other third party. In furtherance of this agreement, the defendant additionally agrees to the following specific terms and conditions:

a) If so requested by the United States, the defendant will promptly submit a completed financial statement to the U.S. Attorney's Office, in a form it provides and as it directs. The defendant promises that such financial statement and disclosures will be complete, accurate, and truthful.

b) The defendant expressly authorizes the U.S. Attorney's Office to obtain a credit report on the defendant in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

c) If so requested by the United States, the defendant will promptly execute authorizations on forms provided by the U.S. Attorney's Office to permit the U.S. Attorney's Office to obtain financial and tax records of the defendant.

12. The defendant acknowledges that the principal benefits to the United States of a plea agreement include the conservation of limited government resources and bringing a certain end to the case. Accordingly, in consideration of the concessions made by the United States in this agreement and as a further demonstration of the defendant's acceptance of responsibility for the offense(s) committed, the defendant voluntarily, knowingly, and intentionally agrees to the following:

a) The defendant will not file a direct appeal of the defendant's conviction(s) or sentence with one exception: The defendant retains the right to appeal a sentence imposed above the sentencing guideline range determined by the Court or above any mandatory minimum sentence deemed applicable by the Court, whichever is greater. The defendant also waives the right to appeal the Court's determination as to whether the defendant's sentence will be consecutive or partially concurrent to any other sentence.

b) The defendant will not file any motions or pleadings pursuant to 28 U.S.C. § 2255 or otherwise collaterally attack the defendant's conviction(s) or sentence, with two exceptions: The defendant retains the right to file a § 2255 motion as to (i) prosecutorial misconduct and (ii) ineffective assistance of counsel.

c) The defendant will not, whether directly or by a representative, request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including, without limitation, any records that may be sought under the Freedom of Information Act, 5 U.S.C. Section 552, or the Privacy Act of 1974, 5 U.S.C. Section 552a.

13. This plea agreement becomes effective once it is signed by the parties and is not contingent on the defendant's entry of a guilty plea. If the United States violates the terms of this plea agreement, the defendant will have the right to withdraw from this agreement. If the defendant violates the terms of this plea agreement in any way (including but not limited to failing to enter guilty plea(s) as agreed herein, moving to withdraw guilty plea(s) after entry, or by violating any court order or any local, state or federal law pending the resolution of this case), then the United States will have the right to void any or all parts of the agreement and may also enforce whatever parts of the agreement it chooses. In addition, the United States may prosecute the defendant for any and all federal crimes that the defendant committed related to this case, including any charges that were dismissed and any other charges which the United States agreed not to pursue. The defendant expressly waives any statute of limitations defense and any constitutional or speedy trial or double jeopardy defense to such a prosecution. The defendant also understands that a violation of

this plea agreement by the defendant does not entitle the defendant to withdraw the defendant's guilty plea(s) in this case.

14. The United States will file a supplement in this case, as required in every case by the Local Rules of the United States District Court for the Eastern District of Tennessee, even though there may or may not be any additional terms. If additional terms are included in the supplement, they are hereby fully incorporated herein.

15. This plea agreement and supplement constitute the full and complete agreement and understanding between the parties concerning the defendant's guilty plea to the above-referenced charge(s), and there are no other agreements, promises, undertakings, or understandings between the defendant and the United States. The parties understand and agree that the terms of this plea agreement can be modified only in writing signed by all of the parties and that any and all other promises, representations, and statements whether made before, contemporaneous with, or after this agreement, are null and void.

FRANCIS M. HAMILTON, III
UNITED STATES ATTORNEY

3/26/25
Date

By: _____
B. Todd Martin
Assistant United States Attorney

3/26/2025
Date

_____
Nathan Hunter Whitaker
Defendant

3/26/2025
Date

_____
Timothy Hudson
Attorney for the Defendant

19

Case 2:25-cr-00042-DCLC-CRW    Document 2    Filed 03/27/25    Page 19 of 19
PageID #: 24